## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHERRY NORRIS,                    )
                                  )
    Plaintiff                 )
                                  )
    v.                        )    Civil Action No. 2:21-cv-291
                                  )    Magistrate Judge Patricia L. Dodge
NLMK PENNSYLVANIA, LLC, and       )
SHARON COATING, LLC,              )
                                  )
    Defendants.               )

### **MEMORANDUM OPINION**[1]

Pending before the Court is the Motion for Summary Judgment (ECF No. 56) and Motion to Strike (ECF No. 74) of Defendants NLMK Pennsylvania, LLC and Sharon Coating, LLC.  For the reasons that follow, the Motion for Summary Judgment will be granted and the Motion to Strike will be denied as moot.

### I.    Relevant Procedural Background

Plaintiff Sherry Norris ("Norris") commenced this action in March 2021 against her former employers, NMLK Pennsylvania, LLC ("NLMK") and Sharon Coating LLC ("Sharon Coating" (collectively, "Defendants").[2]  In her Second Amended Complaint, which is the operative

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. Therefore, the undersigned has the authority to decide dispositive motions and enter final judgment.

[2] The parties dispute whether NMLK is a proper defendant in this case. Defendants contend that NMLK never employed Norris and was a separate entity from Sharon Coating, while Norris contends that NMLK and Sharon Coating share numerous resources and employees such that they are indistinguishable.  (*See* ECF No. 64 ¶¶ 3–8.)  While this issue is addressed in the parties' concise statements of material fact and responses thereto, the parties have not provided any substantive briefing on the applicable legal standard to determine the parties' legal relationship. *Footnote continued on next page….*

pleading, Norris brings six claims against Defendants under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e, *et seq*. ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"): (1) sexual harassment in violation of Title VII, (2) sex discrimination in violation of Title VII, (3) retaliation in violation of Title VII, (4) sexual harassment in violation of the PHRA, (5) sex discrimination in violation of the PHRA, and (6) retaliation in violation of the PHRA.  (*See* ECF No. 44 ¶¶ 65–109.)  After the close of fact discovery in February 2022, Defendants filed their dispositive motion and motion to strike, both of which have been fully briefed.

## II.     Factual Background

### A.    Norris' Employment at Sharon Coating

In 2003, Norris was hired by Winner Steel, which ultimately became Sharon Coating. (ECF No. 64 ¶¶ 1–2.)  Norris worked as the only woman in Sharon Coating's shipping department until she was terminated on September 28, 2018.  (*Id.* ¶¶ 7–9; ECF No. 69 ¶ 340.)  She worked in an area known as "C Door" and loaded/unloaded intermill trucks and storing coils.  (ECF No. 64 ¶¶ 10–11.)  Sharon Coating has plant rules: violations of "A rules" may subject an employee to termination on the first offense, while violations of "B Rules" result in warnings or suspensions (depending on the circumstances).  (*Id.* ¶¶ 39–44.)

Norris contends that she was harassed by male coworkers—Mike Confer, Dave Lasher, Terry Evans, Mike Ashby, and Mike Bloodshaw—throughout her employment.  (*Id.* ¶ 48.)  Norris took detailed notes relating to the workplace during her employment, based on her understanding that the Pennsylvania Human Relations Commission ("PHRC") encouraged her to take notes

---

However, the Court need not resolve this issue, because the Court will grant Defendants' Motion for Summary Judgment in its entirety.

regarding "safety issues, . . . hostile events, or situations going on, or that were directly related to [her]."  (*Id.* ¶¶ 46–47.)

Norris admits that she and her co-workers were always "stirring the pot on each other" and "picking on" each other.  (*Id.* ¶ 135; *see also id.* (Norris' response disputing that "stirring the pot" includes harassment, discrimination, and/or retaliation).)  Norris further admits that all co-workers called each other names and made comments to each other that were not directed at her, including "pussy" or "jagoff."  (*Id.* ¶ 136–37.)

## B.  The Joint Committee on Civil Rights

Norris was a member of Sharon Coating's division of the United Steelworkers Union, which had a collective bargaining agreement ("CBA") with Sharon Coating.  (*Id.* ¶¶ 12, 15; ECF No. 59-8 at 2–63.)  The CBA includes a grievance procedure and provides for a Joint Committee on Civil Rights ("Joint Committee") to discuss, "review and investigate matters involving civil rights and attempt to resolve them."  (*Id.* ¶¶ 18–19, 22.)

The Joint Committee is composed of two union members, the local union president, the union grievance chair and an equal number of Sharon Coating management members.  (*Id.* ¶ 20.) After receiving a complaint, the Joint Committee has a first meeting to discuss the issues and prepare its investigation, and typically will meet with the complainant to discuss the complaint and potential witnesses.  (*Id.* ¶¶ 27–28.)  It is undisputed that the Joint Committee conducts interviews during its investigation.  (*See id.* ¶ 29 (Norris' response disputing whether everyone that she named was interviewed).)  The Joint Committee asks the person about whom the complaint is made to provide their side of the story as well as potential witnesses.  (*Id.* ¶ 30.)  If a Joint Committee member believes additional persons should be interviewed, the Committee does so, even if it

extends the length of investigation.  (*Id.* ¶ 33.)  After completing interviews, the Joint Committee collectively reviews its notes to try to come to a unanimous decision.  (*Id.* ¶¶ 34–35.)  Each Joint Committee member reviews and signs the final report.  (*Id.* ¶ 38.)

### C.  Norris' Allegations About Co-Worker Terry Evans

Norris alleges that Terry Evans (who at all relevant times was a shipper/receiver at Sharon Coating) "engaged in hostile work ethic, that interfered with her job."  (*Id.* ¶¶ 49–50.)  In particular, Norris states that Evans engaged in negative Facebook posts with Mike Confer, even though she has no knowledge of Evans actually posting negative comments about her on Facebook.  (*Id.* ¶ 51.)  She also contends that Evans does not help and divide work equally, for example by arguing with her over who is responsible for which truck or walking away from a truck without letting her know.  (*Id.* ¶¶ 52–53.)  Norris believes that Evan's behavior was based on her gender because she did not "have the ability to, as a woman, to stand up for [herself] as maybe a man would."  (*Id.* ¶ 54.)

Norris also contends that Evans said negative things about her with customers (that she could not recall), but that she overheard him—at some unknown time—call her a "bitch" to truck drivers and make statements like, "why are you talking to her" and "she talks too much and keeps you here."  (*Id.* ¶¶ 56–60.)

### D.  Norris' Allegations About Co-Worker Dave Lasher

Norris alleges that Dave Lasher (who at all relevant times was a shipper/receiver or lead/shipper receiver at Sharon Coating) harassed her by failing to work as a team "on several occasions" thereby leading to a "hostile work environment" where the foreman on a few occasions would tell Norris she was not doing her job.  (*Id.* ¶¶ 61–64.)  Norris "[does not] know" if Lasher's purported conduct was based on her gender (*id.* ¶ 65; ECF No. 65-1 at 41:14–21), but later testified

4

that Lasher referred to her as a "bitch," which she attributes to harassment based on her gender. (ECF No. 64 ¶ 66; ECF No. 65-1 at 42:24–25, 42:3–7, 43:22–24, 44:1, 44:16–21.)  However, Norris did not hear Lasher make this comment to anyone, including the three co-workers she identified as having heard Lasher's comments.  (ECF No. 64 ¶ 67.)

### E.  Norris' Allegations About Co-Worker Mike Ashby

Norris alleges that Mike Ashby (who at all relevant times was a shipper/receiver at Sharon Coating) harassed her when he and Confer smashed her chair and cup.  (*Id.* ¶¶ 68–69.)  Although she did not personally witness the destruction and cannot recall whether this occurred in 2014, 2015 or 2016, Norris contends that a former employee, Harry (whose last name she did not know), witnessed the event.  (*Id.* ¶¶ 71–72.)  Norris believes these actions were based on her gender because the items were hers and bore her name.  (*Id.* ¶ 72.)

Norris also alleged that Ashby made negative remarks to unknown "longhaul" truckers, such as: "[s]he makes it hard to work with. A negative person. You don't know her. I don't know why you talk to her," but did not hear Ashby make such comments and instead learned this from customers.  (*Id.* ¶¶ 73–77; ECF No. 65-1 at 52:8–10.)  Norris testified that she believes these actions were related to her gender, because of her references to name or gender was referenced such as "Sherry, the bitch, [or] her" as the only woman there.  (ECF No. 64 ¶ 78 (Norris' response); ECF No. 65-1 at 52:25–53:18.)

### F.  Norris' Allegations About Co-Worker Mike Bloodshaw

Norris alleges that Mike Bloodshaw (who at all relevant times was a shipper stocker and eventually a shipper/receiver at Sharon Coating) harassed her by making "derogatory comments to drivers and other employers," such as "that bitch knows exactly how I feel about her."  (ECF

No. 64 ¶¶ 79–81.)  Norris did not hear Bloodshaw make this statement but was told by Jeff Carroll, another employee, about it.  (*Id.* ¶ 82.)

Norris also alleges that Bloodshaw created a hostile work environment by "fail[ing] to work as a team member," such that a "foreman would come up and verbally ask why the truck is not unloaded and [she] better get out there and unload it."  (*Id.* ¶¶ 83–84.)  Norris contends that these actions were based on her gender because of Bloodshaw's reference to "bitch" and female pronouns when she is the only woman working there.  (*Id.* ¶ 85 (Norris' response).)

### G.  Norris' Allegations About Co-Worker Mike Confer

Norris alleges that Mike Confer (who at all relevant times was a shipper/receiver at Sharon Coating) harassed her from January 2014 through September 2018 based on her gender.  (*Id.* ¶¶ 86–87.)

It was well-known that Norris and Confer did not get along to the point that it made co-workers uncomfortable, which prompted Norris to apologize to her co-workers "a couple times." (*Id.* ¶¶ 127–128, 131.)  Norris alleges that Confer was very vocal about not liking her and saying that he was going to make her job hard, and she told her co-workers that she did not like the way that Confer acted.  (*Id.* ¶¶ 132–33.)

Norris alleges that Confer harassed her in many ways.  (*Id.* ¶ 88 (Norris' response).)  First, Norris alleges that she was harassed based on Confer's Facebook posts.  After a co-worker told her that Confer was "publicly writing stuff on Facebook," Norris accessed Confer's Facebook post. (*Id.* ¶ 89.)  Norris disputes the fact that she was not named or identified in Facebook posts and further contends that the posts referred to a woman with whom Confer worked and used female pronouns, which necessarily means Norris.  (*Id.* ¶ 90 (Norris' response); *see* ECF No. 65-10 ¶ 4).

6

She also asserts that earlier posts did, in fact, specifically reference her, but that she no longer had access to those posts when this case began. (ECF No. 65-10 ¶ 4). She contends that the earlier posts are "similar to the ones I provided in discovery in which Mr. Confer makes derogatory comments about a woman he works with instead of naming me specifically." (*Id.*) The screenshots in the record, appear to be Facebook re-posts of sarcastic and/or sexists memes or other pictures with commentary and do not reference Norris' name. (ECF No. 65-8 at 103–106.) Rather, they only reference the poster's (someone named "Steeler Man" identified only on a subset of the exhibits) unnamed "coworker" twice. (*Id.*)

Norris also contends that Confer harassed her by damaging her personal property. (ECF No. 64 ¶ 92.) Norris testified that an unnamed coworker told her that Confer had smashed her chair and cup, that coworker Jeff Caroll told her that Confer threw her shirt or coat in the garbage, and that coworker Larry Merchant told her that Confer threw away a calendar because he erroneously thought it belonged to Norris. (*Id.* ¶¶ 93, 95–97.) Norris also testified that she believes Confer took her phone charger. (*Id.* ¶ 94.)

Norris also contends that Confer harassed her by not marking or mismarking "load sheets," and she collected such load sheets as evidence. (*Id.* ¶¶ 98–99 (citing ECF No. 59-6 & 59-7)[3].)

---

[3] Throughout Norris' response to Defendants' concise statement of material fact, ECF No. 64, she denies certain facts because "no Tab F was submitted" with Defendants' brief. Defendants' "Tab F" was originally filed in public view of the docket on March 31, 2022 at ECF Nos. 59-6 & 59-7 along with Defendants' Motion. Norris filed a Motion for Extension of Time to file her response to Defendants Motion on April 25, 2022, which was granted. (ECF Nos. 60 & 61.) On May 3, 2022, the Court received a call from Defendants' paralegal indicating that "Tab F" (ECF Nos. 59-6 & 59-7) filed with the Motion should have been filed under seal. The Court indicated that the parties should confer, and assuming agreement, those exhibits would be removed from public view. ECF Nos. 59-6 & 59-7 were removed from public view on May 5, 2022.

*Footnote continued on next page….*

The parties dispute whether the load sheets indicate that Confer was harassing her based on her gender and it is unknown whether there were incidents in other areas. (*Id.* ¶¶ 100–105). A review of the load sheets (including Norris' separately filed sealed exhibits[4]) show that the overwhelming majority of annotations are related to work issues. (*See* ECF No. 65-8 at 10–102, 107–08; ECF No. 67-1.)

Norris also alleges that Confer made derogatory comments about her, including "this is so the bitch I work with," "[s]he's just a cold turd on a paper plate," "[t]he snitch bitch, long leg, flat chested, turkey neck I work with," among other comments. (*Id.* ¶¶ 107–108.) Norris also alleges that Confer referred to her as a "bitch" to coworkers and unnamed drivers,[5] (ECF No. 64 ¶¶ 111–15), and that co-workers informed her that Confer made additional statements about her:

> She's a bitch. Well, keep her out of here. If she goes upstairs enough times, maybe they'll fire her. I gotta work with her again. Oh, no, she's on our shift. Here we go again. She's here today. She traded with someone and she's on the shift, or she's off the shift. People would tell me, you know, that Mike would say people don't want to work with you. Just – I'm just going to aggravate her until she leaves the department or quits.

---

For the following reasons, the Court is not persuaded by Norris' denials that are based on the fact that "no Tab F was submitted." First, "Tab F" at ECF Nos. 59-6 & 59-7 was visible to the public up until May 5, 2022 (including on the day when Norris sought an extension of her own response deadline). Second, the parties were required to meet and confer to remove such exhibits from public view, which occurred on May 5, 2022. Further, a substantial portion of Defendants' (now, sealed) "Tab F" at ECF Nos. 59-6 & 59-7 overlaps with Norris' own (unsealed) "Tab 8" at ECF No. 65-8 and Norris' own (sealed) "Tab 9" at ECF No. 67. In fact, each time that Norris asserts that "Tab F was not submitted," the document cited by Defendants in "Tab F" bears a "Norris" Bates Number. (*See* ECF No. 64 ¶¶ 11, 46, 99, 109, 146–48 159, 266, 277.) Finally, in resolving the pending Motions, no exhibit that was not otherwise available to Norris on the record is dispositive to the Court's analysis.

[4] Based on the Bates numbers, it appears—though is not clear—that the pages filed under seal may be the back of certain load sheets that were not filed under seal. *See* ECF No. 67-1.

[5] Norris has never provided the names of the drivers despites requests since 2014 despite the fact that she did hear Confer call her "bitch" to one driver in particular. (ECF No. 64 ¶¶ 114–15.)

(*Id.* ¶¶ 121 (citing ECF No. 59-1 at 101:10–19.))  Norris also contends that Confer harassed her by turning up the air conditioning and commenting that it would "keep the bitch out of here" to another coworker.  (*Id.* ¶¶ 118–19.)

Norris—as the only woman working in her area—believes that any time anyone said "bitch," it was said to create a hostile work environment based on her gender.[6]  (*Id.* ¶ 117.)

Finally, Norris also alleges that Confer "purposely" hit her in the head with his lunchbox when he removed it from his shoulder but could not say that this was intentional due to the small size of the room.  (*Id.* ¶¶ 152–154.)

### H. Explicit Picture Near Locker

At one point, Norris saw an explicit picture near her locker.  (*Id.* ¶ 156.)  The parties do not know who put the picture near Norris' locker.  (*Id.* ¶ 157.)  It is undisputed that sexual harassment training was held after this incident, although Norris disputes that the training was held "in response to this incident."  (*Id.* ¶ 159; ECF No. 65-1 at 263:3–16.)  Bartel, the then-Grievance chair for the Union, testified that after this incident, there were never any issues with inappropriate pictures in the workplace again.  (*Id.* ¶ 160.)  Although Norris disputes that Bartel has personal knowledge "of all photographs brought in and/or posted within Defendants' facility from 2015 to

---

[6] Throughout Norris' deposition, defense counsel repeatedly asked what evidence Norris had to suggest that any given behavior was based on her gender.  (*See generally*, ECF No. 65-1.)  Norris' counsel objected to such question as improper and asserts that Norris' testimony itself is evidence.  (ECF No. 64 at 19 n.1.)  Norris further contends that her testimony should be viewed in conjunction with "totality of other employees' behavior toward Ms. Norris, coupled with Defendants' blatant disregard of the ongoing harassment as well as the complete lack of any other women employed in the same area as Ms. Norris."  (ECF No. 64 ¶ 94 (Norris' response).)  As set forth below, the Court has considered the individual (and aggregate) events, testimony, and documentary evidence as appropriate for each of Norris' claims.

2018," there is no evidence in the record that there was another explicit picture found near Norris' locker.  (*Id.*)

### I.   2014 Harassment Complaint Against Mike Confer

Norris made her first complaint of harassment to Sharon Coating in May 2014 based on actions by Confer, who was issued a five-day suspension pending investigation.  (*Id.* ¶¶ 138–140.) As part of the investigation, Sharon Coating contacted witnesses who provided information that that Confer's behavior was inappropriate and was considered harassment of a fellow employee in violation of work rules.  (*Id.* ¶ 141.)  Confer was given a Last Chance Agreement on August 14, 2014, which included scheduling Confer outside of the receiving area until at least January 2015 and providing for immediate termination in the event of any other charges of harassment or inappropriate treatment.  (*Id.* ¶ 144.)  In January 2015, Confer returned to C Door.  (*Id.* ¶¶ 149–51.)

### J.   2015 PHRC Complaints

On July 16, 2015, Norris filed a complaint with the PHRC alleging that management did not take her complaints of harassment by Confer and other male coworkers seriously, refused to conduct a thorough investigation, and returned Confer to his full position with no disciplinary action.  (*Id.* ¶¶ 145–147; ECF No. 65-8 at 124–130.)  On July 21, 2015, Norris filed a second complaint with the PHRC against the union, alleging that it was not adequately representing her based on her gender.  (*Id.* ¶ 148.)

### K.   2017 Harassment Complaint Against Mike Confer

After Confer's return to C Door, Norris contends that he continued to harass her by engaging in the same behavior that led to her May 2014 complaint – harassing her on Facebook,

damaging her personal belongings, not marking load sheets, mismarking load sheets, making negative remarks about her to drivers, and moving coils out of her reach.  (*Id.* ¶¶ 149–51.)

On October 5, 2017, Norris met with Bartel and Leslie Monteleone, HR Manager, to discuss Confer's purported continuing harassment.  (*Id.* ¶ 167.)  Specifically, Norris stated that Confer's harassment from 2014 had continued and identified the following concerns: "(1) Confer creates mistakes, which makes it difficult for her to complete her job duties effectively and timely, but he does not do this for other co-workers; (2) Confer has an agenda to get her fired; (3) Confer refers to her as a 'bitch' and a 'snitch'; (4) Confer encourages other employees not to help her in her area, which causes issues with customers."  (*Id.* ¶ 171.)  A Joint Committee was established for the investigation, and it interviewed Norris followed by Confer.  (*Id.* ¶¶ 169–70, 173–74.) Excluding Confer and Norris, the Joint Committee interviewed 27 people (including external truck drivers), which represented most of the people who were named during the investigation.  (*Id.* ¶¶ 175–79.)  Other than external truck drivers, the individuals interviewed who were generally informed about the issue being investigated figured out that the issues related to Confer and Norris. (*Id.* ¶ 180.)

After the conclusion of the interviews, the Joint Committee evaluated the information as a collective committee, considered all witness interviews, and concluded that it could not substantiate Norris' concerns.  (*Id.* ¶¶ 188–90.)  The Joint Committee found no evidence to support Norris' claim that Confer created mistakes that made it difficult for her to complete her job duties effectively and timely.  (*Id.* ¶ 191.)  One interviewee even said that he admitted to Norris that one mistake was his fault, but that Norris did not believe him and insisted that Confer made the mistake. (*Id.*)  In fact, no interviewee raised any concerns with Norris' work performance, rather confirming

that her work performance was good. (*Id.* ¶ 192.)  Interviews confirmed that Norris expressed a desire for Confer to be fired.  (*Id.* ¶ 193 (Norris' response, admitting a desire to have Confer fired in the "context of reporting Mr. Confer to management saying, 'I don't care if I lose my job as long as he does too.'").)

The Joint Committee unanimously determined that Confer was not harassing Norris; instead, it found that Norris was exhibiting harassing-type behaviors toward Confer, because her complaints made it seem "like she was trying to get [Confer] in trouble."  (*Id.* ¶¶ 195–97.)

After the Joint Committee reached its findings and conclusion, a smaller group met with Norris to provide her with the feedback that they could not substantiate her claims against Confer and were surprised that they confirmed that Norris was engaged in such behavior. (*Id.* ¶¶ 202–205)

Norris was not satisfied with the Joint Committee's findings and filed a grievance on December 6, 2017.  (*Id.* ¶ 208)  The arbitrator found that (1) Sharon Coating did not violate the Civil Rights provision of the Agreement, because evidence that management took Norris' allegations seriously and "immediately, without delay, acted promptly and in accordance with the provisions" of the CBA; (2) there was no evidence to suggest that the interviewees named by Norris were deliberately excluded by the Joint Committee; and (3) "there was no evidence that supported the allegations of harassment as alleged by [Norris]."  (*Id.* ¶¶ 209–214.)  Ultimately, the arbitrator entered an award denying Norris' grievance on May 24, 2018.  (*Id.* ¶ 222.)

Norris filed her third PHRC complaint, and second against Defendants, on June 20, 2018, raising the same concerns relating to Mr. Confer's harassment that were raised with the Civil Rights Committee and in the arbitration.  (*Id.* ¶¶ 224–25.)

**L. Joint Committee 2018 Investigation into David Steiner's Harassment Complaint Against Norris**

Dave Steiner was an intermill truck driver for Sharon Coating who was responsible for taking coils from the line up to the warehouse. (*Id.* ¶¶ 226–27.) His loop included going through C Door, which is where cranemen take off the coils and set them in the yard. (*Id.* ¶¶ 228–29.) Steiner was trained that the intermill drivers are to use the left lane and the outside drivers are to use the right lane. (*Id.* ¶ 230.) Intermill drivers do not need to do anything to notify the employees at C Door that they are ready for the truck to be unloaded. (*Id.* ¶ 231.) Rather, the employees just see the truck and know to begin working. (*Id.*)

The parties dispute the contents of Steiner's and Norris' conversations when he pulled up to C Door. Defendants assert that Norris was always asking questions as to what others were saying about her, while Norris denies ever making such statements. (*Id.* ¶¶ 233–35.) The parties also dispute whether Norris would tell (or yell) at Steiner to go where he was not supposed to, thereby causing other shippers to become angry at Steiner. (*Id.* ¶¶ 236–39.)

On several occasions, Norris contacted the foreman and accused Steiner of fighting. (*Id.* ¶ 240.) The first time was with Larry Merchant, another lead shipper. (*Id.* ¶ 241.) Steiner found out about it when Merchant approached him and said, "I don't know what is going on between you two, but [Norris] just said that we were fighting." (*Id.* ¶ 242.) Steiner and Merchant did not have any fight or disagreement.[7] (*Id.* ¶ 243.)

---

[7] Norris does not dispute that there was not a fight, but instead argues "[b]y way of further clarification, the Steiner-Merchant dialogue that was the basis of this complaint took place in the 'wind tunnel', and, thus, Ms. Norris may have confused loud conversation, to overcome the wind, as an argument." (ECF No. 64 ¶ 243.)

13

The second was with an outside driver, where Ross, the head of safety, came "flying up" in a golf cart and said that he heard Steiner was fighting.  (*Id.* ¶¶ 244–45.)  Ross approached the outside driver first, and the driver said that there was no problem, and then Steiner asked what was going on.  (*Id.* ¶¶ 246–47.)  Ross explained that Norris reported that Steiner was fighting with an outside driver.  (*Id.* ¶ 247–48.)  Steiner never got into a fight with the outside driver; rather, he approached the outside driver regarding timing of pulling his truck.[8]  (*Id.* ¶ 249.)

The third alleged fight was between Steiner and another employee, Dave Boylan.  (*Id.* ¶ 250.)  Steiner did not think that Boylan needed to call the foreman regarding an issue, and when the foreman did report to the scene, the foreman agreed that there was a misunderstanding.[9]  (*Id.* ¶ 252–53.)  Boylan told Steiner that Norris approached him and asked him to report Steiner. (*Id.* ¶ 254.)

Eventually, Steiner reported Norris' behavior to Ross, who directed him to HR.  (*Id.* ¶ 257.)  Steiner ultimately filed a complaint against Norris.  (*Id.* ¶ 259.)[10]  Norris points to the length of time between Steiner's "documented discussion" with HR on April 27, 2018 and his formal complaint on August 7, 2018 as a purported "irregularity" relevant to the timing of her second PHRC/EEOC complaint regarding her treatment at Defendants' facility.  (*Id.* ¶¶ 259, 262 (Norris' response); *see also* ECF No. 65-6 at 42–46; ECF No. 65-8 at 117.)

---

[8] Again, Norris does not dispute this fact, but instead states "[b]y way of further clarification, Ms. Norris was instructed to report the fight by a second outside truck driver, who told Ms. Norris there was a fight between an outside truck driver and an intermill truck driver."  (ECF No. 64 ¶ 249.)

[9] Norris does not dispute this fact but contends that "[b]y way of further clarification, [that] there was, at a minimum, a verbal altercation between Mr. Steiner and Mr. Boylan that resulted in both of them yelling at each other, leaving their vehicles, and Mr. Boylan calling management."  (ECF No. 64 ¶ 250.)

[10] In her responsive concise statement of material facts, Norris accidentality numbered her response to Defendants' statement of material fact ¶ 257 (making Norris' response ¶ 258). The Court proceeds based on the numeration in ECF No. 64.

Because Steiner's formal complaint raised several concerns, including that Norris was attempting to have him fired by fabricating accusations and complaining that Norris was harassing him, a Joint Committee was formed to investigate several issues:

- Norris encouraged Dave Boylan, a crane operator, to report Steiner for an altercation they had even though Norris was not involved in the altercation.
- Norris falsely accused Steiner of being involved in an altercation with an external truck driver.
- Norris stood in the aisle, blocking him, which interfered with his job duties.
- Norris did not communicate with Steiner about only unloading one full coil and leaving two half coils to be unloaded.
- Norris repeatedly reported Steiner to the union and supervisors.
- Norris has said to others that "I can't believe I hate a truck driver worse than Scott Savchuck."

(*Id.* ¶¶ 260–62, 264[11]; *see also* ECF No. 59-8 at 69; ECF No. 65-6 at 43.)

The Joint Committee interviewed at least 14 people as part of the investigation.  (*Id.* ¶¶ 265.)  Upon the conclusion of the investigation, the Joint Committee was able to substantiate most Mr. Steiner's concerns and found that:

- Norris approached Boylan two or three times, encouraging him to report Steiner, despite Boylan's insistence that he and Steiner were not involved in an altercation (*id.* ¶ 269);
- Norris made a false accusation when she called the supervisor and reported that Steiner was in a fight with an external truck driver (*id.* ¶¶ 270–272);
- There was no evidence to confirm that Norris stood in the middle of the aisle, blocking Steiner (*id.* ¶¶ 273–275);
- There was evidence to support Steiner's contention that Norris did not unload all of the coils and failed to communicate with Steiner (*id.* ¶ 276; *see also*, *id.* ¶ 277 (admitting that she unloaded only half of the truck but asserting that this was because the employees used an "imaginary wall" to separate work); *see also* ECF No. 69 ¶¶ 351–55 (parties disputing application of "imaginary wall");
- Norris repeatedly reported Steiner to supervisors and the union (ECF No. 64 ¶ 279);

---

[11] Norris' denial of the list appears to be based on the fact that Defendants' have summarized the allegations listed in the Joint Committee's report rather than copied them verbatim.  (*See* ECF No. 64 ¶ 264.)  There is no genuine dispute of material fact between Defendants' and Norris' lists except that Defendants' list omitted the allegation that Norris said "I can't believe I hate a truck driver worse than Scott Savchuck."

- Two employees confirmed that they heard Norris say "I can't believe that I hate a truck driver worse than Scott Savchuk" however one employee could not remember the exact wording. All parties believed that she was speaking about Dave Steiner, although he was not specifically named by her (*id.* ¶ 280 (parties disputing exact finding); ECF No. 59-8 at 71; ECF No. 65-6 at 45)).

On September 21, 2018, the Joint Committee reached its determination and validated many of Steiner's allegations against Norris. (*Id.* ¶ 281.) The Joint Committee unanimously agreed to all factual findings but did not agree on resolution. (*Id.* ¶¶ 282–84.) Norris was suspended while management determined how to resolve the matter. (*Id.* ¶ 285.)

### M. Norris' Termination

Taborek, Monteleone, and Benson were all involved in the decision to terminate Norris. (*Id.* ¶ 286.) On September 24, 2018, Monteleone sent Taborek an email outline with notes identifying the various work rules that Norris violated in preparation for Norris' discharge meeting. (*Id.* ¶ 288; *see* ECF No. 65-6 at 167–69.) This outline included additional rule violations that were detected during the Joint Committee's investigation into Steiner's complaint. (*Id.* ¶ 289.)

Management found that Norris violated Rule A4 – Falsification/Misrepresentation, based on four events. (*Id.* ¶ 290.) Norris argues that only two events were "validated" by the Joint Committee: the fact that she contacted management about Steiner fighting with an outside truck driver and that she told Bloodsaw "you know you got two 1/2s on there" although Bloodsaw denied this. (*Id.* ¶ 290 (Norris' response).) She further takes issue with the fact that the event with Bloodsaw was validated solely based on his statements. (*Id.*)

With respect to her denial that she said "I can't believe that I hate a truck driver worse than Scott Savchuck," Norris asserts that this event was only "confirmed" but not "validated." (*Id.*) Based on the Joint Committee findings, this does not appear to be a genuine dispute of material

fact, as two witnesses at least confirmed that they heard Norris say something along these lines that was believed to be about Steiner. (*See* ECF No. 59-8 at 71; ECF No. 65-6 at 45 ("Gary Kane and Marcus Kerr confirmed they heard [Norris] say this. Marcus could not confirm that was the exact words, but she said that. All parties believe that she was speaking about Dave Steiner, however it should be noted it was not said specifically by her.")).)

Finally, with respect to the false statement that Norris reported the incident on August 23, 2018 where Lasher almost hit her with a tow motor, Norris questions management's "validation" when it watched a video that was subsequently misplaced and is unavailable for the current case. (*Id.* ¶ 290 (Norris' response).)

Management also found that Norris had violated Rule A11 – Coercing Fellow Employees, because after Taborek instructed her at the end of her interview to not speak with her coworkers about the ongoing investigation, she then spoke with her supervisor as well as several other people about the investigation. (*Id.* ¶¶ 294–97.) Norris does not deny that she spoke with her supervisor as well as several other people about the investigation, but disputes that it was "coercing." (*Id.* ¶¶ 296–97.)

Management additionally found that Norris violated Rule A18 – Harassment, but Norris contends that her underlying behavior does not support that finding and that other workers with similar seniority and records were not terminated as a result of such behavior. (*Id.* ¶¶ 299–300, 302.) Management also found that Norris violated Rule B3 – Failure to Report an Accident No Matter How Minor They Seem, which is not a terminable offense by itself. (*Id.* ¶¶ 303–04.) Once again, Norris contends her underlying behavior does not support that finding. (*Id.*)

A discharge meeting was held on September 26, 2018.  (*Id.* ¶ 305.)  When determining whether to terminate Plaintiff's employment, management considered all of its options, and decided that just and proper cause existed to convert the suspension to a termination based on the following actions: "creating a hostile work environment, falsification/misrepresentation of information, coercing fellow employees, harassment, failure to report an accident or near miss, insubordination and interfering with other employees on their jobs." (*Id.* ¶¶ 309–10.)  Norris was terminated effective September 28, 2018.  (*Id.* ¶ 311.)  Norris again denies that her conduct supports these findings.  (*Id.* ¶ 310 (Norris' response).)

After the termination of her employment, Norris filed a grievance through the union and an arbitration hearing was held on November 14, 2018.  (*Id.* ¶¶ 312–13.)  Upon review of the evidence, the arbitrator determined that there was evidence to confirm Steiner's allegations and that Norris provided no facts to support her contentions.  (*Id.* ¶ 318.)  In fact, Norris did not dispute that the incidents occurred but stated that "there were reasonable explanations for what occurred in each situation." (*Id.* ¶ 319.)  The arbitrator found that the evidence showed that Norris' behavior could be for no other purpose other than to "mak[e] Mr. Steiner look bad in supervision's eyes" or to "intimidate" him, and other witnesses confirmed Steiner's allegations.  (*Id.* ¶¶ 320–21.)  The arbitrator found that, again, Norris did not deny that the events happened, but stated that "what took place should not be viewed [in the way that] Steiner and the other witnesses who testified [view it]" and called the allegations a "witch hunt."  (*Id.* ¶ 322.)

The arbitrator determined that there was no "witch hunt" and stated that the complaint was a "legitimate concern raised by an employee entitled to a work place which was free from intimation [sic] and harassment." (*Id.* ¶ 323.)  Ultimately, the arbitrator denied Norris' grievance

and found that her behavior was "totally inappropriate, was uncalled for, and resulted in there being a hostile work environment," which "gave the Company just cause to terminate her employment." (*Id.* ¶¶ 324–25.)

Plaintiff filed a fourth complaint (her third against Defendants) with the PHRC on March 15, 2019, raising the same issues that she raised in her arbitration as well as a retaliation charge. (*Id.* ¶ 326.)  In the retaliation charge, Norris contends that her employment was terminated because she filed a complaint with the PHRC.  (*Id.* ¶ 327.)  The PHRC dismissed all of Norris' charges on November 10, 2020.  (*Id.* ¶ 329.)

### III.  Defendant's Motion to Strike Norris' Declaration

In response to Norris' response in opposition to Defendants' Motion for Summary Judgment, Norris included a declaration.  (ECF No. 65-10.)  Defendants moved to strike certain portions of the declaration pursuant to the sham affidavit doctrine.  (ECF No. 74.)

Defendants allege a series of statements that contradict Norris prior sworn testimony, including:

- Norris' assertion that Confer's harassment included calling her 'c-nt,' and 'whore' when she had never testified that Confer called her a 'c-nt,' and 'whore' despite multiple complaints since May 2014 (ECF No. 75 at 3);
- Norris' assertion that Confer began sharing Facebook posts that specifically referenced her by name and using derogatory terms such as 'snitch bitch,' and calling her "'flat chested' and 'turkey neck'" despite prior testimony that her name was not included in the Facebook posts and that she had no evidence that Confer posted Facebook pictures referencing her (*id.*);
- Norris' assertion that management "waited months before addressing the issue with Mr. Confer," despite her admission that she made her first complaint about Mr. Confer's Facebook posts in May 2014 and the investigation was completed by July 2014 (*id.* at 4);
- Norris' assertion that she began noticing "persistent errors in the staging of coils" in her area, particularly after Mr. Confer worked and that the "concentration and severity of the 'errors' in [her] work area were abnormal and much more numerous than [her] coworkers," despite her sworn testimony in this case and the prior

arbitration that mistakes "were not uncommon and made by all employees" and that she has not examined all other load sheets to determine if mistakes were made for others (*id.* at 4–5);

- Norris' assertion that she "personally overheard her coworkers, including Mr. Confer, refer to [her] in derogatory terms among themselves and with outside truck drivers," despite testifying that she only heard Terry Evans and Mike Confer (and no other coworkers) make comments about her on two occasions (*id.* at 5);

- Norris assertion that she "was not able to mount a sufficient defense or tell [her] side of the story due to only [sic] the fact that only one of my witnesses was available the day my hearing was schedule[d]," despite testifying that she and her union representatives had the opportunity to ask questions of the company's witnesses as well as her own witnesses and that she had every opportunity to use her witnesses to support her story and that she had three witnesses (*id.* at 6).

Norris opposes Defendants' Motion to Strike and contends that her declaration either clarifies previous testimony or provides further information, rather than contradicts her previous testimony. (*See e.g.*, ECF No. 76).

As discussed below, even if the facts in Norris' declaration are considered, Defendants' Motion for Summary Judgment must be granted. Thus, the Court need not resolve the parties' dispute as to Norris' declaration and will deny Defendants' Motion to Strike as moot.

### IV.    Standard of Review

As the Federal Rules of Civil Procedure provide, summary judgment must be granted if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence which shows the lack of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Once that burden has been met, the non-moving party must set forth "specific facts

showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Id.* (internal citation omitted). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cty. of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

**V.   Discussion**

   **A.   Summary Judgment Will Be Granted in Favor of Defendants on the Claims of Sexual Harassment in Violation of Title VII and the PHRA**

"Sexual harassment that creates a hostile work environment clearly violates Title VII." *Starnes v. Butler Cty. Court of Common Pleas*, 971 F.3d 416, 428 (3d Cir. 2020) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "Under Title VII, a hostile work environment exists 'when the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'" *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993))).

To succeed on a hostile work environment claim, a plaintiff must demonstrate that (1) she suffered intentional discrimination because of her gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person of the same gender in like circumstances; and (5) a basis for *respondeat superior* liability is present. *Starnes*, 971 F.3d at 428. Because the same

standard applies to PHRA claims, the Court will address both Count 1 and Count 4 together.  *See Szyper v. Am. Med. Response Mid-Atlantic, Inc.*, Civ. A. No. 20-4642, 2021 WL 5711826, at *3 (E.D. Pa. Dec. 1, 2021) (applying the same standard in a PHRA claim).  "Whether an environment is hostile requires looking at the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  "The relevant inquiry for a hostile environment claim is not whether a plaintiff's workplace was generally abusive or unpleasant, but whether the hostility was driven by intentional gender-based discrimination." *Dolan v. Penn Millers Ins. Co.*, 625 F. App'x 91, 93–94 (3d Cir. 2015) (citing *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006)).

Here, Defendants move for summary judgment on the grounds that Norris cannot demonstrate evidence of factors (1), (2), (4), and (5).  Even assuming Norris suffered intentional discrimination *because of* her gender, for the reasons set forth below, the Court finds that viewing the facts in the light most favorable Norris and drawing all reasonable inferences and resolve all doubts in her favor, Norris cannot demonstrate that the discrimination was severe or pervasive and the discrimination would have detrimentally affected a reasonable person of the same gender in like circumstances.  Further, Norris has not established a basis for *respondeat superior* liability.

1.  Norris Has Failed to Show that the Alleged Discrimination was Severe or Pervasive and that It Would Detrimentally Affect a Reasonable Person of the Same Gender in Like Circumstances

Even assuming that Norris met her burden with respect to first prong (which the Court need not decide), the Court finds no reasonable jury could find that the discrimination was severe or

pervasive or the discrimination would have detrimentally affected a reasonable person of the same gender in like circumstances.

"The inquiry into whether the discriminatory or retaliatory environment was 'severe or pervasive' recognizes that less severe isolated incidents which would not themselves rise to the level of retaliation may, when taken together as part of 'the overall scenario,' evidence retaliatory animus, and one severe incident may be enough to create a hostile work environment." *Komis v. Sec'y of U.S. Dept. of Labor*, 918 F.3d 289, 293–94 (3d Cir. 2019). Furthermore, "[t]he Supreme Court has 'made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment,' and that '[t]he standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code.'" *Donahue-Cavlovic v. Borough of Baldwin*, Civ. A. No. 2:15-cv-1649, 2017 WL 4862072, at *7 (W.D. Pa. Oct. 26, 2017) (quoting *Obergantschnig v. Saw Creek Estates Comm. Ass'n, Inc.*, Civ. A. No. 12-cv-5911, 2013 WL 5676328, at *4 (E.D. Pa. Oct. 18, 2013)).

As a result, "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" cannot evidence a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 280 (3d Cir. 2001) ("The Supreme Court has stated that Title VII is not violated by the mere utterance of an [ ] epithet which engenders offensive feelings in an employee or by mere discourtesy or rudeness, unless so severe or pervasive as to constitute an objective change in the conditions of employment") (internal quotation marks omitted)).

With respect to the issue of pervasive conduct, courts in this Circuit have been steadfast in finding that "general, unsubstantiated allegations that the alleged conduct occurred 'regularly' or

'all the time'" are insufficient to defeat summary judgment.  *Nitkin v. Main Line Health*, No. CV 20-4825-KSM, 2021 WL 4860742, at *11 (E.D. Pa. Oct. 18, 2021); *see also Collins v. Kindred Hosps. E., LLC*, Civ. A. No. 14-17, 2016 WL 4264588, at *14 (W.D. Pa. Aug. 12, 2016) (explaining that "[g]eneral claims that there were a lot of incidents [of harassment] are insufficient where the plaintiff did not testify about the specifics of the general claim").  Instead, a plaintiff must describe specific instances of misconduct.  *See Nitkin*, 2021 WL 4860742, at *11. Courts will look only to identified specific events when determining whether a material issue of fact exists.  *See, e.g.*, *Nitkin*, 2021 WL 4860742, at *11–*12 (considering only the seven incidents that plaintiff described in her deposition testimony on summary judgment despite the fact that plaintiff had also represented that "she would be unable to recount every single time [a supervisor] made sexually inappropriate comments during the weekly team meetings 'because there were so many'").

Finally, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII purview."  *Harris*, 510 U.S. at 21.  In looking at whether discrimination would have detrimentally affected a reasonable person of the same gender in like circumstances, the Court looks at all the circumstances including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*,  at 23.

Here, Norris' complaints of harassment boil down the following issues over the course of four years: (1) she was called "bitch," "c-nt," and "whore" in the workplace at times by fellow employees; (2) her load sheets had mistakes in them; (3) one explicit picture was found near her

24

locker; (4) several personal items were destroyed or removed (cup, chairs, phone charge, jacket); and (5) Facebook posts by certain employees referenced Norris by name (or, more generally, a woman with whom the poster worked).  These complaints include only a handful of specific instances (one explicit picture found near locker and missing or destroyed cup, chairs, phone charge, jacket) along with some continuous general allegations (mismarked load sheets, name-calling, and Facebook posts).

Even when the totality of these events and the fact that Norris was the only woman at C Door are considered, these incidents do not equate to an "overall scenario" evidencing retaliatory animus; nor is the conduct extreme enough to "amount to a change in the terms and conditions of employment."  *Donahue-Cavlovic*, 2017 WL 4862072, at *7 (quoting *Obergantschnig*, 2013 WL 5676328, at *4).  While undoubtedly unpleasant for Norris, taken together, these facts are "ordinary tribulations of the workplace" and do not rise to the level of a hostile work environment.

Here, it is undisputed that employees referred to each other by derogatory names during work.  (ECF No. 64 ¶¶ 136–37.)  Although Norris generally contends that she was referred to "bitch," "c-nt," and "whore," she only outlines a few examples in which she was called a "bitch"—leaving the other instances unspecified over the period of four years.  The specific instances that Norris identifies where "bitch" was used are undetailed or related to work issues.  (*See e.g.*, ECF No. 64 ¶ 112 (contending that Confer marked a load sheet and told the driver to "give it to the bitch up there."); ECF No. 69 ¶ 337(b) (external driver interview notes stating that "Sam" said "here take the bill down to the bitch."); ECF No. 64 ¶ 118 (contending that Confer said "keep the bitch out of here"); ECF No. 65-1 at 84:21–24 (contending that "[w]hen a driver checked in to get a load sheet, [Confer] handed them the sheet and said, give it to the bitch up there"); *id.* at 101:10–

19 (contending that Confer said: "She's a bitch. Well, keep her out of here. If she goes upstairs enough times, maybe they'll fire her. I gotta work with her again. Oh, no, she's on our shift….")); *see Bumbarger*, 170 F. Supp. 3d at 827 (analyzing the specific instances where plaintiff was called "bitch" and collecting cases where the use of profanities, even based upon substantiated evidence, were insufficient to establish that the harassment is severe or pervasive.)

Although interview notes from the Joint Committee reflect that one employee, Willy Jones, recounted that Norris was called a "c-nt" and "whore" (ECF No. 65-5 at 95 ("Lasher uses the 'C' word"), 125 ("People saying she's a c-nt or hor (sic)")), it was not until filing her declaration that Norris asserted she was called a "c-nt" or "whore" by *Confer* (as opposed to Lasher) without any details to the specific incident involved.  (ECF No. 65-10 ¶ 3 ("In 2014, Mike Confer began harassing me. The harassment involved calling me derogatory terms while at work such as 'bitch,' 'c-nt,' and 'whore.'").)  These general allegations are insufficient to survive summary judgment. Even though the Willy Jones's interview notes may substantiate some name-calling, viewing the record as a whole, the Court find that such name calling does not amount to severe or pervasive conduct.  Similarly, over the course of four years, only one explicit picture was found near her locker (with no evidence of any other explicit pictures thereafter) such that the Court does not find the incident to be severe or pervasive.

While the load sheets reflect mismarkings and mistakes, even drawing all inferences in favor of Norris, the Court cannot conclude that this is indicative of discrimination that was severe or pervasive as opposed to mere mistakes in the workplace.  Indeed, Norris rejected a colleague's assertion that certain errors were his fault.  (ECF No. 64 ¶ 191; *see also*, ECF No. 65-2 at 154:8–13 (Taborek testifying that "Larry Merchant literally went back to [Norris] and said that couldn't

have been Mike Confer.  That was me that worked there, and that was me that made a mistake. It was an honest mistake. And when she goes, had to be Mike Confer, I don't believe you…"). Further, although Norris' declaration states that she "began noticing persistent errors in the staging of coils in my area" when Confer worked and that the "the concentration and severity of the 'errors' in my work area were abnormal and much more numerous than my coworkers," (ECF No. 65-10 ¶ 10), in her responsive concise statement of material fact she denies knowledge of other employees' mistakes by stating that she "does not have required expertise or experience to speak for the workmanship of all the employees Defendants' employ."  (ECF No. 64 ¶ 104.)  Norris' own assertion as to the rate of errors in her locations as opposed to her co-workers, especially when considered with her admission that she cannot speak on the issue of other employee mistakes, is insufficient to show that the issues were severe or pervasive.

Finally, with respect to the Facebook posts, even if they did reference Norris by name as she contends in her declaration (ECF No. 65-10 ¶ 3), the ones in the record which she alleges are "similar" to those that identified her by name, while sarcastic and/or sexist, again do not rise to severe or pervasive conduct.  (ECF No. 65-10 ¶¶ 3–4; ECF No. 65-8 at 103–106.).  *See Chinery v. Am. Airlines*, 778 F. App'x 142, 145–46 (3d Cir. 2019) ("Although some posts [containing 'insulting photographs, posts referring to [plaintiff] and her supporters by using derogatory language, and a post warning that the author believed he was being 'f**ked with' by those campaigning against Union incumbents'] are offensive, they constitute only 'offhand comments[] and isolated incidents' that are insufficiently extreme to amount to an objective change in the terms and conditions of employment.")

Considering, in turn, all of the above conduct in the aggregate, and the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Harris*, 510 U.S. at 23, the Court concludes that no reasonable jury could find that this behavior was sufficiently severe or pervasive to satisfy the third prong or to create an objectively hostile work environment to satisfy the fourth prong.

    2.   <u>Norris Has Failed to Establish a Basis for Defendants' Liability for Their Employee's Actions</u>

Finally, the Court also finds that no reasonable jury could find that Norris has established a basis to hold Defendants liable.

"The fifth element . . . establishes the basis on which to hold the employer liable." *Huston v. Procter & Gamble Paper Prods*. Corp., 568 F.3d 100, 104 (3d Cir. 2009). "'[W]hen the hostile work environment is created by . . . non-supervisory coworkers,' employers are 'not automatically liable' in all instances." *In re Tribune Media Co.,* 902 F.3d 384, 400 (3d Cir. 2018). "Rather, employer liability . . . exists only if [(1)] the employer failed to provide a reasonable avenue for complaint or . . . [(2)] the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Id.* (quoting *Huston*, 568 F.3d at 104)). Norris contends that Defendants failed to provide a reasonable avenue for complaints because they failed between 2014 and 2017 to form a Joint Committee regarding any of her complaints against Confer, and that Defendants failed to take prompt and appropriate remedial action by returning Confer to Norris' work area and not addressing her complaints. (ECF No. 63 at 20–22.)

Although the Norris complained about Confer (and her other coworkers) for a variety of reasons over four years,[12] the record does not support her claim that a Joint Committee should be formed upon every single (unidentified) complaint she had during the span of four years or that the responses taken were not appropriate.  (*See* ECF No. 65-2 at 63:3–8 (Taborek noting that in his six-year tenure, there have only been three Joint Committees—two of which were formed for Norris), 60:5–8 ("[P]eople typically have multiple avenues to go to stuff. There is an ethics line, union representation. They can make complaints to anybody.").)  As discussed above, an employer must provide a *reasonable* avenue for complaint.

Here, Norris' general allegation that she complained to various individuals in the workplace are insufficient to show that her employers did not provide a *reasonable* avenue given unknown scope or content of any discrete complaint.  (ECF No. 62 at 21 (asserting "continued documenting and reporting of the consistent 'mistakes' by Confer and other co-workers in her area when [Norris] worked.").)  For the same reason, Norris' contention that "Defendants returned Confer to Norris's work area and did not address [her] numerous complaints for more than two years" is equally uncompelling as she has not pointed to the circumstances of specific complaints

---

[12] (ECF No. 65-2 at 37:2–4 (Taborek testifying that "she was constantly complaining about everybody and everything . . . ."), 57:1-8 ("She had a way of talking to people,  complaining about people, you know… [employees] were afraid she was going to target them next for these complaints, calling supervisors about little stuff that you would have to come down and talk about."), 153:17–22 (Norris "would do was manipulate reality and constantly complain about people, for a long time. People wanted to -- they were switching shifts not to work with her. They wanted to avoid her."), 155:4–8 ("My perception of what they were describing to me was they were scared, because her MO was to tell the supervisor about anything fictional or real or minimal or major, to make them look bad and to pick them, because she wanted control.");  ECF No. 65-1 267:19–24 (Norris admitting to "writ[ing] down safety issues, … hostile events, or situations going on, or that were directly related to [her]"); *id.* at 270:1–5 (Norris unable to answer "[h]ow many times would [she] call a foreman during a 40 hour workweek, on your fellow workers").)

that she attempted to bring to management's attention and was not provided a reasonable avenue to do so.  (ECF No. 63 at 30.)

Taking the facts in the light most favorable Norris and drawing all reasonable inferences in her favor, no reasonable jury could find that Defendants failed to provide a reasonable avenue for her complaints or knew or should have known of the harassment and failed to take prompt and appropriate remedial actions.

### B. <u>Summary Judgment Will Be Granted in Favor of Defendants for Norris' Claims of Sex Discrimination in Violation of Title VII and the PHRA</u>

To establish a prima facie case of disparate treatment, a plaintiff must demonstrate: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of unlawful discrimination.  *Anderson v. Mercer Cty. Sheriff Dep't*, 815 F. App'x 664, 666 (3d Cir. 2020); *Jones v. SEPTA,* 796 F.3d 323, 327 (3d Cir. 2015).  The same analysis applies to Norris' PHRA claim.  *Rosencrans v. Quixote Enters.,* 755 F. App'x 139, 141 (3d Cir. 2018) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

The parties' dispute centers on the third and fourth elements.  Defendants contend that Norris' prima facie claim of sex discrimination fails because verbal warnings, disciplinary meetings, or investigations are not adverse employment action.   (ECF No. 57 at 17–19.) Defendants further contend that Norris has failed to adduce any evidence to demonstrate that her male counterparts were treated more favorably.  (*Id.*)

There are two ways to satisfy the fourth element: "(1) introduce evidence of comparators (*i.e.*, similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence

that otherwise shows a causal nexus between [her] membership in a protected class and the adverse employment action." *Drummer v. Hosp. of Univ. of Pa.*, 455 F. Supp. 3d 160, 168 (E.D. Pa. 2020) (quoting *Greene v. V.I. Water & Power Auth.*, 557 F. App'x. 189, 195 (3d Cir. 2014)); *see Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 268–69 (3d Cir. 2010) (stating "comparative evidence is often highly probative of discrimination, [but] it is not an essential element of a plaintiff's case").

Norris contends that by focusing on whether Norris' verbal warning, disciplinary meeting, or investigation are adverse employment actions, Defendants ignore her ultimate termination. (ECF No. 63 at 20 (Norris contending that "[e]ven if it were true that being subjected to a disciplinary meeting is insufficient to show an adverse employment action, *this is not the question before the Court—it is undisputed that Defendants terminated Plaintiff's employment*.") (emphasis added).) Thus, Norris concentrates her legal argument on her termination, which is an adverse employment action. 42 U.S.C.S. § 2000e-2(a)(1).  However, her evidence—instances where she believes she was treated differently from similarly situated co-workers—misses the mark as many of these instances are not related to her termination.  (ECF No. 63 at 11–13.)  Notably, while Norris lists a number of instances in which she claims she was treated differently than similarly situated employees (ECF No. 63 at 11–13), only two of her listed examples are related to her termination: (1) Norris being terminated for harassment while Confer was not terminated but given a Last Chance Agreement and (2) Norris' discussion of the 2018 Joint Committee with a supervisor, which was cited as a reason for her termination.  (*Id.* ¶¶ 294–97 (finding that Norris had violated Rule A11 – Coercing Fellow Employees, after Taborek instructed Norris at the end of her interview to not speak with her coworkers about the investigation).)

With respect to these two incidents, Norris has failed to offer a similarly situated individual for comparison.  First, regarding Confer, although Norris asserts that he had similar seniority and received a Last Chance Agreement instead of termination, Norris has offered no evidence that Confer was considered by management to have violated *other rules* in conjunction with harassment.  (*See* ECF No. 65-6 at 78 (Notice of Disciplinary Action against for "Harassment of a fellow employee. Engaging in activities that would create a hostile work environment."); *id.* at 79 (Last Chance Agreement noting that "testimony supports that Mr. Confer's behavior was inappropriate and considered harassment"))

With respect to Norris' assertion that Steiner said to a "coworker that 'you're either on her side or my side and if you're on her side you're going down,' but was not disciplined for discussing the Joint Committee investigation" (ECF No. 63 at 7 n.6; ECF No. 64 ¶ 298), Norris has also failed to demonstrate that Steiner was similarly situated to her and was considered by management to have violated multiple rules.

Notably, while Norris disputes management's characterization of certain incidents as rule "violations," she admitted during arbitration that she did not dispute that certain incidents underlying her termination occurred but instead sought to justify her position by stating that "there were reasonable explanations for what occurred in each situation."  *See* ECF No. 64 ¶¶ 318–19; *see also*, *id.* ¶¶ 243, 249 (admitting that fights had not taken place while providing explanations as to why Norris thought they had.)

All other incidents[13] cited by Norris relate to alleged (unspecified) discipline and warnings related to violations of company policy.  Although Norris cites to case law for the proposition that a violation of company policy can constitute pretext where other similarly situated individuals also violate the same policy with no adverse consequences, such examples must nevertheless be related to the pertinent adverse employment action.  (ECF No. 63 at 12–13 (citing *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 322 (3d Cir. 2000) and *Bryant v. Platinum Fluid Sols., LLC*, CV 17-722, 2019 WL 426487, at *4 (W.D. Pa. Feb. 4, 2019).)   Here, by focusing on her termination, Norris has not offered any legal argument or evidence to show how any of these other (unspecified) instances of discipline and warnings constitute an adverse employment action.  *Jones*, 796 F.3d at 326 (describing an adverse employment action "as an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" (citing *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)).

Even if such incidents related to (unspecified) discipline and warnings were adverse employment actions, about which the Court cannot reach any conclusion because Norris has failed

---

[13] The other incidents include:
- Plaintiff being forced to purchase and wear safety glasses while her co-workers were not disciplined for failure to wear them on multiple occasions.
- Plaintiff being warned on multiple occasions that having her hair down was a rule violation and told to put it up while her co-workers continued to leave their long hair down.
- Plaintiff being disciplined for not wearing proper safety equipment while her co-workers failed to wear safety equipment with no repercussions.
- Plaintiff being disciplined for reporting repeated safety violations of her co-workers despite Defendants encouraging such an action among employees.

(ECF No. 63 at 13.)

to describe how she was "disciplined" or "warned," Norris has failed to identify specific co-workers as similarly situated individuals.

In conclusion, taking the facts in the light most favorable to Norris and drawing all reasonable inferences in her favor, no reasonable jury could find that Confer or Steiner were substantially similar persons with respect to the two incidents related to her termination.

Further, no reasonable jury could find that the unspecified warnings and discipline constitute adverse employment actions. Thus, Norris has not met her burden with respect to a *prima facie* case.

### C.  Summary Judgment Will Be Granted in Favor of Defendants for Norris' Claims of Retaliation in Violation of Title VII and the PHRA

#### 1.  Norris Has Failed to Make Her Prima Facie Case

Retaliation is also subject to the familiar *McDonnell-Douglas* approach. First, plaintiff must establish her *prima facie* case that (1) she engaged in protected activity; (2) the defendants took action that a reasonable employee would find to be materially adverse in that it might have dissuaded a reasonable worker from making a complaint; and (3) a causal connection between her protected activity and the adverse action. *Moore v. City of Phila.*, 461 F.3d 331, 341–42 (3d Cir. 2006). The same analysis applies to Norris' PHRA claim. *Hussein v. UPMC Mercy Hosp.*, 466 F. App'x 108, 111 (3d Cir. 2012) (citing *Fogleman v. Mercy Hosp.*, 283 F.3d 561, 567 (3d Cir. 2002)).

To establish a causal link between the protected activity and the adverse employment action, a plaintiff may rely on a "broad array of evidence," for example, temporal proximity, a pattern of antagonism, inconsistent explanations for the adverse action, or other similar circumstantial evidence. *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017);

34

*see also*, *Kieffer v. CPR Restoration & Cleaning Services, LLC*, 733 F. App'x 632, 638 (3d Cir. 2018) ("To demonstrate a causal connection, a plaintiff generally must show either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.") (citing *Budhun v. Reading Hosp. & Medical Center*, 765 F.3d 245, 258 (3d Cir. 2014)).

Defendants contend that Norris cannot demonstrate a *prima facie* case of retaliation. First, Defendants contend that a verbal warning, a meeting/investigation, and the failure to take preventive measures to prevent further harassment, are not adverse employment actions. (ECF No. 57 at 20.) With respect to suspension and termination, Defendants contend that Norris fails to establish a causal connection between her adverse action and any protected activity in light of her internal and external complaints. (ECF No. 57 at 21–22 (noting a three-month gap between the second PHRC complaint (June 20, 2018) and the date of her termination as a basis for her retaliation claim (September 28, 2018).)

Like her analysis of the discrimination claims, Norris focuses her response exclusively on her termination (ECF No. 63 at 22–30), and thus the Court does so as well.

Norris contends that she can establish a causal connection between her protected activity and termination, by pointing to Steiner's "documented discussion" on April 27, 2018 and the fact that a formal complaint by Steiner was not opened until August 7, 2018, which was 48 days after her PHRC/EEOC complaint in June 2018. (ECF No. 63 at 24.) Norris also contends that the Defendants' irregular formation and operation of the Joint Committee and the selective enforcement of rules against Plaintiff also support a finding of causal connection. (*Id.*)

First, neither the timing between her PHRC/EEOC complaint on June 20, 2018 and Steiner's formal complaint 48 days later on August 7, 2018 nor the timing between Norris' PHRC/EEOC complaint on June 20, 2018 and her termination 100 days later on September 28, 2018, is "unusually suggestive of retaliatory motive."  *See Kilpatrick v. Sec'y, U.S. Dep't of Veterans Affairs*, 754 F. App'x 123, 126–27 (3d Cir. 2018) (the fact that EEOC complaint was made approximately six weeks before the issuance of the proposed removal notice and over three months before the effective date of termination was not "unusually suggestive of retaliatory motive.").  Although Norris points to the fact that Steiner had a documented discussion in April 2018 and characterizes this as "irregular," both testimonial evidence and Joint Committee documents establish that Steiner did not file a formal complaint until August 7, 2018 as well as the reasons why he did not do so before then.  ECF No. 65-6 at 42 (Complaint dated 8/7/2018), 166 ("David [Steiner] just wanted this info documented in case something is said regarding any of these issues in the future"); ECF No. 65-4 at 79:12–80:15 (Benson explaining that Joint Committee gets formed only after complaint is filed);  ECF No. 65-2 at 59:6–61:16 (Taborek describing different ways in which Steiner's initial complaints could be raised and how Steiner did not want follow-up to April 2018 complaint).)  Further, the Joint Committee's summary of its investigation states that it was formed on September 17, 2018, interviewed Steiner and Norris the same day, and then interviewed at least 14 witnesses between September 19 and 21, 2018.  (ECF No. 65-6 at 43.)

On September 21, 2018, the Joint Committee came to the unanimous conclusion that most of—*but not all*—of Steiner's complaints against Norris were substantiated.  (*Id.* at 44–45.)  Neither party disputes the Joint Committee has only a fact-finding mission.  (ECF No. 64 ¶ 23 (citing ECF No. 65-2 at 25:6–8 (Taborek testifying "[t]he committee itself has no power to enforce discipline.

It solely is responsible to investigate.")).)  Instead, management determines how to resolve the matter, and did so by terminating Norris on September 26, 2018 after considering all of its options. (ECF No. 64 ¶¶ 285, 305, 309.)

Here, taking the facts in the light most favorable to Norris and drawing all reasonable inferences in her favor, no reasonable jury could find that Norris established a causal connection between the timing of her PHRC/EEOC complaint and her suspension/termination.

> ## 2. Even if Norris Had Met Her Prima Facie Burden, Defendants Have Advanced a Legitimate, Non-Retaliatory Reason and She Has Failed to Provide Evidence of Pretext

Even if Norris had met her prima facie burden, Norris fails to offer evidence that Defendants' reasons for her termination were pretextual.

If an employee establishes their *prima facie* case, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct.  *Moore*, 461 F.3d at 342.  Norris does not dispute that Defendants have offered several legitimate, non-retaliatory reasons for her termination.  (*See* ECF No. 63 at 24; ECF No. 57 at 23 (citing Joint Committee substantiating most of Steiner's complaints against Norris and finding other policy violations, including A-level rules such as false accusation against a co-worker and attempted coercion during the course of the Steiner investigation)).

Thus, the Court moves to the third step of the *McDonnell Douglas* approach in which a plaintiff must provide some evidence from which a jury could reasonably find that "both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore*, 461 F.3d at 342 (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)).

To demonstrate pretext, a "plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

Norris' first argument is that "Defendants subjected Norris, the only woman in her work area, to discipline for acts it permitted other employees to do."  (ECF No. 63 at 15, 24.)  Norris does not identify any specific individuals.  *Id.*  To the extent she relies on her list of acts identified in the context of her sex discrimination claim, the Court has already addressed how the majority of these acts were not related to her termination (and instead were undefined "discipline" and "warnings." (*See supra* pp. 2.) Further, with respect to the few incidents that were related to her termination, the Court has already found that she has failed to identify a similarly situated individual.  (*Id.*)  Without more information on the context of such incidents, the Court finds that Norris has failed to point to evidence from which a factfinder could reasonably disbelieve Defendants' articulated legitimate reasons or believe that a discriminatory reason was more likely than not a motivating or determinative cause her termination. As such, Norris' first argument regarding pretext fails.

Norris' second argument to show that her termination was pretextual is that "the 2018 Joint Committee was conducted in a peculiar manner." (ECF No. 63 at 15, 24).  The Court is not persuaded that the fact that Steiner "wanted [the events] documented in case something is said regarding any of these issues in the future" in April 2018, but only formally complained in August 2018 is evidence of pretext.  Given Norris' long history and record of "documenting" her issues

with her co-workers, the fact that another co-worker documented his own issues with Norris before formally complaining is not evidence by which a reasonable factfinder could disbelieve Defendants' reasons or believe that her prior complaints were more likely than not a motivating or determinative cause of her termination.

Norris's final argument that her termination was pretextual is that Defendants searched for a rationale to justify her termination after placing her on a five-day suspension. (ECF No. 63 at 6–8, 15, 24.) Norris contends that the list shared between Monteleone and Taborek included incidents that were not investigated by the Joint Committee. (*Id.*) However, a comparison of this list to the 2018 Joint Committee findings shows that many of the incidents cited for her termination were related to or arose out of the 2018 Joint Committee investigation. (*Compare* ECF No. 65-6 at 168–69 *with id.* at 44–45 (both documents addressing Norris repeatedly encouraging Boylan to report a fight, Norris' statements regarding her feelings for a truck driver, Norris' failure to communicate with respect to certain coils, Norris' statement about Steiner with an outside truck drive)). As discussed above (*see supra* pp. 13–14, 32–33 ), while Norris disputes management's characterization of her behavior as rule violations, she admits that the underlying behavior did in fact occur and she attempts to further explain why she viewed the situation the way she did.

In light of Norris' admission that the underlying behavior in fact occurred and the fact that the Joint Committee's findings overlap with many of her reasons for termination, the Court finds that Norris has not identified evidence would allow a factfinder to reasonably disbelieve the Defendants' reasons for her termination or believe that her prior complaints were more likely than not a motivating or determinative cause of her termination.

**VI.     Conclusion**

For these reasons, the Court will grant Defendants' Motion for Summary Judgment and will dismiss all of Norris' claims against Defendants. Further, the Court will deny as moot Defendants' Motion to Strike.

An appropriate Order follows.


BY THE COURT:


Dated: October 19, 2022                    /s/ Patricia L. Dodge
                                           PATRICIA L. DODGE
                                           UNITED STATES MAGISTRATE JUDGE